UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
UNITED STATES OF AMERICA,           )  Criminal Action
                                    )  No. 21-282-3
vs.                                 )
                                    )
ELIAS IRIZARRY,                     )  March 15, 2023
                                    )  4:09 p.m.
                    Defendant.      )  Washington, D.C.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


**TRANSCRIPT OF SENTENCING**
**(REDACTED)**
**BEFORE THE HONORABLE TANYA S. CHUTKAN,**
**UNITED STATES DISTRICT COURT JUDGE**


**APPEARANCES**:


FOR THE UNITED STATES:
                    ASHLEY AKERS
                    DOJ-CIV
                    Commercial Litigation Branch
                    1100 L Street Northwest
                    Washington, DC 20530
                    (202) 353-0521
                    Email: ashley.akers@usdoj.gov

FOR THE DEFENDANT:
                    EUGENE JEEN-YOUNG KIM OHM
                    Federal Public Defender
                    for the District of Columbia
                    625 Indiana Avenue, NW
                    Washington, DC 20004
                    (202) 208-7500
                    Email: eugene_ohm@fd.org


ALSO PRESENT:        AMI LANDON, U.S. Probation

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                     Official Court Reporter


Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Your Honor, we have Criminal Action 21-282-3, United States of America versus Elias Irizarry.

We have Ms. Ashley Akers representing the government and Mr. Eugene Ohm representing Mr. Irizarry; they are all appearing in person.  And we also have Ms. Ami Landon representing probation; she's appearing in person as well.

THE COURT:  All right.  Good afternoon.

Good afternoon, Mr. Irizarry.

THE DEFENDANT:  Good afternoon, Your Honor.

THE COURT:  All right.  And you have family members in the courtroom.  Do you want to say who they are?

THE DEFENDANT:  That's my mother, my sister, and my girlfriend, Your Honor.

THE COURT:  Good afternoon.  I read all of your letters.

All right.  So we are here for the sentencing of Mr. Irizarry who pleaded guilty to entering and remaining in a restricted building or grounds in violation of 18 U.S.C. Section 1752(a)(1).

Before we begin, Mr. Bradley, is the public line open?

Okay.  The public line is open.  I ordered it to

be open because these cases are of sufficient public interest that, I think, people who are not here and want to listen in should be given that opportunity.

However, Mr. Ohm and Ms. Akers, if there is going to be any mention -- I have, obviously, read all of the pleadings which have been filed under seal.  But any medical issues, I want you to let me know and I will go off -- we'll seal that portion, we'll close the public line for that portion.  But I have read all of the materials including the defendant's reply which was filed last night or this morning.  But I have read that.

Okay.  Let me just tell you-all what I have received and reviewed in preparation for this sentencing: The presentence report and the sentencing recommendation, and the following documents submitted by counsel in advance of the hearing; the plea agreement that was signed by Mr. Irizarry and the government; sentencing memoranda from the government and from Mr. Irizarry, including a reply letter from Mr. Irizarry; 12 letters of support from Mr. Irizarry from various family members --

Do you want -- I can put them on the record, but I don't have to.  Okay.

-- including supervisors, people who he has come in contact with at various levels of his education, members of the community; various awards and certificates; his

firefighter training certifications; his transcript, suspension letter, and guidance counselor recommendation from the Citadel; his transcript from the College of Charleston; his transcript from Nation Ford High School, and his community service records.

Am I leaving out anything, Ms. Akers?

MS. AKERS:  No, Your Honor.

THE COURT:  I've also reviewed the video exhibits that the government submitted.

I was not able to view the ones that were in, like, a PDF form, but I was able to look at all of the regular video.

MS. AKERS:  That was just an index listing.

THE COURT:  Okay.  It did look like a PDF, all right.  So I saw the video exhibits that the government submitted.

Am I missing anything, Mr. Ohm?

MR. OHM:  No, Your Honor.

THE COURT:  Okay.  Let me first begin with the presentence report.

The final presentence report and sentencing recommendation were filed in this matter on March 8, 2023.

Ms. Akers -- is it Akers?  Am I pronouncing it --

MS. AKERS:  Yes.  Thank you, Your Honor.

THE COURT:  Is there any objection to any of the

factual determinations set forth in the presentence report?

MS. AKERS:  No, Your Honor.

THE COURT:  Are you expecting an evidentiary hearing or do you have any witnesses you want to present?

MS. AKERS:  No, Your Honor.

THE COURT:  Are you seeking to play any of the video exhibits?

MS. AKERS:  Only on request of Your Honor, but since you have watched them already --

THE COURT:  I have seen them.  Sometimes people like to play them.

MS. AKERS:  Then, no.  Thank you.

THE COURT:  Mr. Irizarry, are you fully satisfied with the services of Mr. Ohm in this case?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Yes.  If you stay there, make sure --

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you feel you have had enough time to talk to him about the probation department's presentence report, and the papers filed by the government in connection with the sentencing?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Mr. Ohm, have you and Mr. Irizarry read and discussed the presentence report?

MR. OHM:  We have, Your Honor.

THE COURT:  Are there any disputed issues of fact?  That is, does Mr. Irizarry have any objection to any of the factual statements set forth in the presentence report?

MR. OHM:  Your Honor, there are a couple of minor -- there are a couple of factual errors that I don't think is necessarily relevant to the Court's sentencing.  Mr. Irizarry pointed them out, and I had not passed them along to Ms. Landon.

One is that it cites him as being non-Hispanic; his family is of Hispanic origin.  One, on paragraph 35, says that the restitution amount is $2,000 --

THE COURT:  You mean as contemplated in the plea agreement?

MR. OHM:  Yes.

THE COURT:  Isn't it 500?

MR. OHM:  Yes.

THE COURT:  Okay.

MR. OHM:  And then, paragraph 60 relates -- I think is too narrow in its time frame, in terms of things relating to diagnosis.

THE COURT:  Mr. Ohm, my problem is there is a process for this, right?

MR. OHM:  Yes, Your Honor.

THE COURT:  You-all -- you and the government get the draft presentence report and you can make any objections

to any factual corrections.

My report says the defendant and defense counsel did not submit objections to the presentence report.  So it's kind of unfair to me to have -- and to the probation officer -- to have us hearing about factual objections or factual disputes at the sentencing because the time to have brought this up would have been when you had an opportunity; that's why we do it.

I will say that, as a matter of -- it's pretty clear that it should be $500, not $2,000.  I think 2000 is for felonies, so that should be corrected.

But I am not inclined to order anything else corrected because I think you waived that by not submitting those corrections.  And frankly, I don't think they are material to the -- at the time when you would have -- you were asked if you had any objections.

MR. OHM:  I understand, Your Honor.

THE COURT:  All right.  With the exception of the change to the mandatory restitution of 500, instead of $2,000, I will accept the factual recitations set forth in the presentence report regarding the circumstances of the offense and, therefore, the facts as stated in the presentence report will be my findings of fact for the purpose of this sentencing.

All right.  The presentence report lays out the

probation office's calculation of the advisory guideline range that applies in this case.  This calculation was done using the 2021 guidelines manual, and is as follows: Beginning with the guidelines offense level, the applicable guideline in this case is Section 2B2.3(a), which has a base-offense level of 4.  The parties agreed to a 2-level increase pursuant to Section 2B2.3(b)(1)(A)(7).

The government has also represented that Mr. Irizarry has demonstrated acceptance of responsibility in a manner that entitles him to a 2-level reduction under Section 3E1.1(a).  Therefore, before I consider any departures or variances, Mr. Irizarry's total offense level is 4.

Are there any objections to the calculation of the offense level, Ms. Akers?

MS. AKERS:  No, Your Honor.

THE COURT:  Mr. Ohm?

MR. OHM:  No, Your Honor.

THE COURT:  Turning to the applicable criminal history category, the presentence investigation has found that Mr. Irizarry has zero prior convictions and received criminal history points in the guidelines manual, and that these lack of convictions give him a criminal history subtotal of zero, which puts him in Criminal History Category I.

Any objections to the criminal history calculation?

MS. AKERS:  No, Your Honor.

THE COURT:  Mr. Ohm?

MR. OHM:  No, Your Honor.

THE COURT:  Based on the offense level and criminal history category I have just discussed, the presentence report calculates the guideline sentencing range to be zero to six months of imprisonment.

Having determined that the applicable guidelines range, the next step is for me to consider departures.

The presentence report does not include any departure grounds and, under the terms of the plea agreement, both parties have agreed that there are no grounds for imposing a sentence outside of the guideline range that is based on the policy statement in the guidelines manual.

Is that correct, Ms. Akers?

MS. AKERS:  Yes, Your Honor.

THE COURT:  Mr. Ohm?

MR. OHM:  Yes, Your Honor.

THE COURT:  Now, Section 3553 requires me to consider a variety of factors including the sentencing range, the guidelines prescribed, which I have just gone over, as well as the applicable penal statutes.

The charge of entering and remaining in a restricted building or grounds in violation of 18 U.S.C. Section 1752(a)(1) carries a statutory maximum penalty of one year of imprisonment.  No mandatory minimum is applicable, and Mr. Irizarry is eligible for up to five years of probation because the offense is a misdemeanor.

If a term of imprisonment is imposed, the statutes provide that Mr. Irizarry faces a supervised release range following imprisonment of not more than a year while, under the guidelines, that range is also one year.

The statute of conviction sets a maximum fine of up to $100,000 -- excuse me -- of $100,000, while the guidelines fine range is between $500 and $9,500.  A special assessment of $25 is mandatory.  And as part of the plea agreement, Mr. Irizarry agreed to pay restitution to the Architect of the Capitol in the amount of $500.

I have one question for you, Ms. Landon.

If there were to be a period of incarceration imposed, is a period of supervised release mandatory following that?

MS. LANDON:  One second.

THE COURT:  You-all can weigh in as well.

MS. LANDON:  Your Honor, the Court may impose a term of supervised release of not more than one year for guideline provisions for Class A misdemeanors.  If a

sentence of imprisonment of one year or less is imposed, a term of supervised release is optional.

THE COURT:  Thank you.

Does anyone disagree with that?

MS. AKERS:  No.

THE COURT:  Mr. Ohm?

MR. OHM:  No, Your Honor.

THE COURT:  All right.  So given that, have I stated accurately the statutory guidelines framework under which we are operating, Ms. Akers?

Have I stated accurately the guidelines --

MS. AKERS:  Yes, Your Honor.  Thank you.

THE COURT:  Mr. Ohm?

MR. OHM:  Yes, Your Honor.

THE COURT:  All right.  Before I discuss the other sentencing factors that will bear on my final decision, the parties already know what the probation office has recommended.

Taking into account the guidelines range and all of the factors under 3553(a), the probation office recommends 14 days of incarceration, $500 in restitution, and a $25 special assessment.  The $25 special assessment is mandatory for a misdemeanor charge.  The probation office does not recommend probation, supervised release, community service, or a fine.

The recommendation of the probation office is not based on any facts or circumstances that have not already been revealed to the parties in the presentence report.

As you know, Mr. Irizarry, I am not bound by that presentence report -- by the probation office recommendation; I frequently depart from it, both up and down. But it is helpful for the Court to have that recommendation.

So at this point I will give the parties an opportunity to address the Court.

Ms. Akers.

Again, I caution that if you want to talk about anything having to do with medical conditions, that you let me know so we can turn off the public line and place that under seal.

MS. AKERS:  Thank you, Your Honor.

I am going to start just by -- not reminding, but remembering how important days like today -- sentencings -- are based on the gravity of January 6th and how dangerous and tragic it was to our democracy because the Capitol Building, the physical manifestation of our legislative branch was attacked, and it was trashed.  And the people inside the Capitol Building, the lawmakers, were hiding in the Capitol Building scared for their lives.  And the people outside the Capitol Building protecting the building,

United States Capitol Police, and their counterparts, were being assaulted and were using their bodies to protect the building and those inside it.

All of the participants on January 6th, including this defendant, were responsible for the gravity of that harm on this day.  So I want to talk about a few things that set this defendant apart from others, and especially those who were charged with misdemeanors.

THE COURT:  Can I stop you a minute, Ms. Akers.

I am going to -- this is unusual.  But Mrs. Irizarry -- is that your last name?

MRS. IRIZARRY:  Yes.

THE COURT:  Have you seen the video footage from that day?

MRS. IRIZARRY:  Yes.

THE COURT:  Have you seen the video footage of your son?

MRS. IRIZARRY:  Yes.

THE COURT:  Okay.  Because sometimes I get people -- family members who haven't.  So I want to make sure we're all operating under a full awareness of what happened.

MRS. IRIZARRY:  Yes, Your Honor.  I have seen it.

THE COURT:  All right.

Go on, Ms. Akers.

MRS. IRIZARRY:  Thank you for asking.

MS. AKERS:  On January 6, 2021, this defendant brazenly rampaged around the Capitol grounds on both the west side, on the east side, and in the Capitol Building while wielding a metal pole, something that he carried with him throughout the day, for about four hours, while he was on Capitol grounds in the building.

This defendant in particular -- not only did he wield the metal pole for hours, he was at very pivotal points in the breach and the fall of the police line on the west front, on the east front, and in the Capitol Building.

So starting first with on the west front, this defendant appeared on the lower west terrace early in the breach on January 6th.  He was in the crowd when a CDU, a civil disturbance unit, was trying to make their way up to the Capitol to protect the building.  And he was in the group of people who physically attacked that CDU unit making its way up the building.

Now, this defendant didn't physically do anything, but he was there.  He was next to his codefendant; who Your Honor knows did use the pole that he was carrying to hit an officer.  So he was there when that happened.

He was also there -- and this is in our first photo, Figure 1, in our sentencing memo, at the front of the line, the MPD police line that fell shortly after this

defendant was seen at that line.

So he was not only there on the lower west terrace when officers were being assaulted and trying to get to the line, he was also there right before the MPD line fell. While he was there, he was using his metal pole and pumping it in the air while rioters around him chanted shortly before the line fell.

This defendant --

THE COURT:  There is no allegation that he ever hit anybody or wielded it in any way as a weapon, right?

MS. AKERS:  He did not hit anyone to our knowledge, that's correct.

I would say he was certainly wielding it all around the building and outside.  In many of the photos and videos it was in the air.

THE COURT:  But there is no allegation that he ever hit anybody.

MS. AKERS:  That is correct.

I do think that he certainly wielded; it was not as though it was by his side.

THE COURT:  I saw the video, yes.

MS. AKERS:  Then he climbed the scaffolding up to the upper west terrace, which is again conduct that is really showing his knowledge of his wrongfulness.

Once he got up to the upper west terrace, as Your

Honor knows from the video, he and his codefendant were waving people and saying:  Go up the stairs.  You can see his pole waving at people who were trying to make it up to the upper west terrace.

This defendant proceeded to the Senate wing door about 13 minutes after it had just been breached.  He climbed through the window.  There is broken glass everywhere.  Sirens are going.  There is a small number of officers in riot gear trying to block the entrance to the senators who are on the left.

So there was every indication at that point -- and leading up to that point, quite honestly -- that he should not have been there.  But he remained; and he and his codefendant proceeded throughout the building.

While he was in the building for almost 30 minutes, this defendant was sort of all over the place.  He was in the Senate wing foyer area; he was in the Crypt; he was in the Rotunda.  He was in at least four different hallways; hallways that were smoke filled.  He was climbing on statues in the Rotunda.  He took the elevator up to the fourth floor where congressional committees have their meeting rooms.  He went into a committee room on the first floor where he sat on a chair -- that's commonly sat on by senators doing actual business on behalf of our country -- with his pole in his lap, smiling.

So when he was in the building he was not passive; he was an active participant. You can see him in the Crypt holding up, wielding, his metal pole all throughout.

And then, after he left the Capitol Building, he proceeds to the east side, which is another thing that sets this defendant apart. He was on both sides of the building. And the east side saw a lot of violence against officers later in the day when this defendant was there.

This defendant was on the stairs, again, with his pole in the air. He was chanting, he was yelling. He climbed on a government vehicle where he sat for a while; similar to climbing on the statues in the Capitol, similar to climbing on the scaffolding on the west side. He was all over the place.

He only left after officers finally gained control of the area and were able to push the rioters off the Capitol grounds. So this defendant's really elongated participation in the Capitol, outside of the Capitol on the west front and the east front really justified the recommendation that the government is making here today, which is for 45 days of incarceration.

THE COURT: Thank you, Ms. Akers.

MS. AKERS: Thank you.

THE COURT: Mr. Ohm.

MR. OHM: Thank you, Your Honor.

I always wonder if the government, after they read my sentencing memo, if they would ever change -- learning more information about the nature and circumstances of an individual --

THE COURT:  Everybody is doing their job.

MR. OHM:  Your Honor, let me just say when these cases --

THE COURT:  I will say this, I thought your sentencing materials were really good and gave me a full picture of Mr. Irizarry and took full advantage of your job -- your ability to paint a fulsome picture of who he is and not just what he did, so I appreciate that.

MR. OHM:  Thank you, Your Honor.

As the Court knows, we are asking for a sentence of probation for Mr. Irizarry.

I think I want to start by addressing what the government was talking about here.  The government is absolutely right.  Everything about the Capitol and what happened on January 6th was a shame.

The government is right that what Mr. Irizarry found himself a part of he should have -- he should have known -- he should have known he should have gotten out of there.  He knows that.  He has said that.

Now, I have to say, though, when we look at it and when he has looked at the video since, there are all of

these cues that we see that he was not processing.

There are things that we are talking about that are more obvious.  But when we look at, sort of, the look on people's faces, for example, on the videos or the anger in people's eyes, the people that he's associated with -- these are not things he was thinking about or processing.  I mean, there are things that Your Honor and I, I am sure Ms. Akers -- we have seen these videos over and over and over again.  There is always something that you see that's new, that's a little bit striking and shocking.

Now, when these cases -- I remember on January 6th, being in front of the news and thinking about how I would be defending individuals that are charged, like Mr. Irizarry.

I mean, I -- I didn't grow up around here, but I've lived here for a while; I have raised children around here.  The Capitol is a special institution to all of us.  I mean, that's -- one of the first things that all of my children could identify is the Capitol Building, as we drove by, that's special to us.

I have told all of my clients, these judges -- right outside their building is the Capitol Building.  They have worked hard to get that nice window view; it's something special.

THE COURT:  I don't look towards the Capitol.  I

look away.  I have turned down offices with the Capitol view, but that's just because of other reasons.  But I hear you.  It is something.  It is something.  It reminds you every single day of --

MR. OHM:  It really does.

When you talk to your colleagues, your friends, people in the area -- you know that the people -- the people of the District, it was personal.  And it felt personal.

When I first met Elias -- when I first saw his name on a lockup list, my first thought was, like:  Great, a teenage insurrectionist.  Then I got to learn about him, learn about his family, talked to the people who support him.  I mean, he is a real different person.  He is a different person, a different defendant, and certainly a different January 6th defendant.  Not only because he is a nice and caring kid and that he is this achiever, but he has dedicated himself to public service in a number of different ways, not just by wanting to be in the armed service.  He is not this sort of macho, "I just want to be in the army" kind of guy.

But if you look at his community service record, he has been thoughtful about the things that he has contributed his time to.  It's been steady, constant, and complete.  It hasn't been this half-hearted college application kind of community service.  It was real.

But then he met his half-brother Ash and decided to be in the armed services.  His goal in his life has been, for the last several years, to be an officer in the armed services.  That, as the Court knows, is likely a dream that's gone.  That conviction will mean that he will likely not be in the armed services.

THE COURT:  He is allowed to reapply to the Citadel, isn't he?

MR. OHM:  So Citadel as a college he is allowed to reapply to.  He has been discharged, which means that -- it's not a suspension in that he doesn't automatically come back.

THE COURT:  Right.

MR. OHM:  It's not an expulsion in that he is allowed to reapply.  But it has been made clear to him that there is, certainly, no guarantee that that is going to happen.

THE COURT:  Right.

MR. OHM:  The accomplishments -- I have a 16-year-old kid.

I mean, the accomplishments that Elias did, especially with all of the tumult that was going on through his childhood is something different, and it's something special.  The amount of discipline and all of these reports of kindness, him being a good person, it's really sort of

hard to reconcile with, I guess, number one, my view of individuals on January 6th to begin with, before I met any of these folks; and number two, my view of January 6th people after I met some of those folks.  Elias has always been different.

It's also -- one of the most troubling, puzzling things for me is that he wasn't even a particularly Trump-y kind of person, I mean, especially relative to some of my other clients.  He, as it turned out, didn't want to go to this rally.  There were conversations that he had with his friends and one of his codefendants, that this was all stupid; the election-denying thing is stupid.

THE COURT:  I take it you have never had a 19-year-old son, Mr. Ohm.  Not yet.  I have; twice.

MR. OHM:  Well, I will tell you this, this 19 -- well, now 21-year-old -- probably talks to me more than my own children do, my teenage children.

THE COURT:  That is unusual.

MR. OHM:  I am fully aware of how he has been thinking through what all of this is about.

In the end, I realize that this was about a freshman in college who came home.  And I have thought about that experience when I was a kid.  I have nephews who are 19.  That freshman semester where you are adjusting and sort of getting to know things -- a lot of people get dumped by

their girlfriends after their first semester of freshman year. All of this was going on, and Elias was homesick.

One of his best buddies, his codefendant, was going off to boot camp, and he wanted to spend time with him. He and his mother had plans to go on a road trip. His mom got sick, so Elliot invited him. Because he was so young he talked to his mother about it; his mother said no. But then Mrs. Bishai, Elliot's mother, calls up Mrs. Irizarry, says, well, it's with my church group, which is another fascinating thing about January 6th. But the church took a bus to go, there were children -- there were 3-, 4-year old kids who came down --

THE COURT: They used to do that with hangings, too, Mr. Ohm. I still don't understand it. But there you have it.

MR. OHM: And it sounded like it wasn't that big of a deal. I know Your Honor -- I know it because -- I know you know it. I know that I know it through discovery from other cases, there is a whole simmering world where people are talking about what was going to happen that day. But for some people, like probably us, but also some people who might be -- by affiliation, by association, Trump supporters, didn't know what all was being planned for that day.

So he ends up going. They end up going inside the

building.  His recollection was that he was trying to call -- he and Elliot were trying to call Grayson; they couldn't get in touch with him.  They went in.

At the same time, we are not here -- he is not here to say that he wouldn't have otherwise gone in because he doesn't recall -- frankly, when he looks at the video, there are so many things he doesn't recall.  He has said to me, the sirens -- I knew they were saying that, but I don't actually -- I do not remember hearing the sirens.

He certainly didn't remember it as this frantic -- the energy that was in the Capitol while he was going in. What does that mean in terms of who Elias is, and what was his role in this?

Now, one of the things that I noticed about Elias that I had not heard from other people is his constant use of the word "shame."  Because, to me, that's the appropriate word for people who are involved in this who recognize what they have done and what they were part of even -- almost especially for people who are charged with misdemeanors who are not -- they might not have had this, but they know that they are forever associated with all of these other people. And presumably, because they were charged with misdemeanors they didn't have the same view as all of these other folks who seem like they knew exactly what they were doing and exactly what they were there for.

When Elias talks about this -- I mean, this has been since day one.  He feels that he shamed his name.  He is embarrassed that he -- we have conversations.  His parents are Mexican.  We have conversations that there were a lot of Latino people in January 6th.  He feels shame that he has contributed to that reputation.  He feels shame because of what he has brought to the Citadel.  Because when he gets reported back home -- newspapers report this stuff pretty regularly.  Every time something happens, it's always "Citadel student."  He knows that he has discredited the institution.  He knows that has discredited his family, the people who have looked after him and, also, the nation which he really cares about.

It's not just that he is ashamed in terms of the images and what it's done to democracy.  Your Honor, I had some thoughts about whether I should edit out all of the history, stuff about democracy, but I realize this is who he is.  He is a 21-year-old poli-sci student.  This is what he thinks about and this is one of the things that he really regrets.

It's also, though, the shame because he was associated with the harming of police officers.  And Elias is somebody who -- I mean, he is frankly like -- he is the good kid who wants to be in the military and he respects police.  This is how he was raised.  These are important

values to him.

In discovery, one thing I asked him about -- I think he mentioned this. There were several searches for Brian Sicknick. And he explained to me that when he heard about what happened to Officer Sicknick that he looked him up. And he found out that Officer Sicknick was -- lived not that far away from where he grew up in New Jersey; he is from Toms River.

He learned that Officer Sicknick was in the Civil Air Patrol when he was a teenager, just like Elias was. So he on his own -- and this is before he was arrested. This was before anybody knew about him. What they did is -- what he looked at was the victim, and he identified with the victim. This is before court, Your Honor. That's what made him feel bad.

In fact, none of my other clients have done this. Elias has actually contributed his first paycheck to the Capitol officers memorial fund because he wanted -- he doesn't want it to feel like it's just words. One of the things that he's told me, one thing I want to make clear is -- like, so many of these people get up there, they just say stuff. And then they come back and they say the opposite. How are you ever supposed to know -- he has actually told me, Your Honor -- and I warned him because Your Honor was a defense lawyer. He told me, if the judge

has any questions -- I want her to be able to ask any questions she wants of me so she knows --

THE COURT:  I would have asked him anyway.

MR. OHM:  So that she knows that he is sincere in his remorse.

Your Honor, he has been -- he has done so well up until this point, and he has done so well with very difficult circumstances.

Not only did he work -- did he earn scholarships to go to a college; he got into a college that had a relatively reasonable tuition.  He only has $40,000 in student loans after two years.  He was working his butt off to really get as many credits as possible because he was afraid that what he thought was going to happen is what happened.  He wanted me to mention that was the driving force of him wanting to go to that summer trip.

THE COURT:  Did he actually go?

MR. OHM:  He couldn't.  The decision came down too late, and he lost the scholarship.  But he doesn't regret that at all.  Certainly, he understood everything in terms of what the Court was saying, but --

THE COURT:  Maybe you did.  I certainly don't still.

MR. OHM:  I mean, this Court.

THE COURT:  Oh, me.

I was talking about the Court of Appeals.  I have moved on.  Good job for you, Mr. Ohm.  Good job.

MR. OHM:  I'm sorry.

But in any case -- as the Court probably doesn't know, he is not the one who knows what is appealable or not.  That was probably something that had to do with his lawyer who was also in trial at the time.

THE COURT:  You are doing your job.

MR. OHM:  So in any case, Your Honor, he did not; but that was his primary objective.

He wasn't trying to enjoy -- and he certainly didn't want to offend the Court by asking the Court to think of him as anyone else.  The primary reason that we waited a long time was because of me.  All of my clients waited a long time, as the Court can probably recall from other cases in front of Your Honor.  And that's because we just did not know how this was going to play out.  I had a difficult time advising any of my clients in terms of what to do until there were at least a couple of dispositions in these cases.  In particular, my release clients; we were not in a particular rush.

We made several pitches to the U.S. Attorney's Office as to find other resolutions of this before -- but Mr. Irizarry himself knew he was going to be either pleading guilty or pleading open the entire time.  Those were the

options that we were talking about.

I want to talk about this idea that -- I know that what the government is sort of insinuating is, by Figure 1, that Mr. Irizarry saw the front line of officers there and saw the scuffle that was going on.  I would just point out, Your Honor, that even from this picture, which seems to be elevated, you really can't see the officers.

Mr. Irizarry is not a tall young man; he is a few inches shorter than me even.  He didn't see any of it.  He can tell Your Honor himself.  But I did go back through all of the videos with that in mind, to see if there is anything that he possibly could have seen.  The closest that I came was the thing with Mr. Sherrill.

I will tell the Court that after he learned about that, on the car ride home the following day, he and Mr. Bishai actually decided to un-friend Mr. Sherrill from their social media accounts and to stop having any contact with him because they were, frankly, shocked that that is what he did.  That is not who he is in terms of a person -- in terms of a person who has an inordinate respect for law enforcement.

So as I sort of processed all of the things that Elias has done throughout his life, all of his achievements and all of his accomplishments, I mean, it really is hard to envision when you see the video how this person can be this

person.

And it's interesting that Your Honor asked Mrs. Irizarry, because the way I think of -- especially my younger clients, I mean, I think of my own son and how I would react if he made that kind of choice.  I had a difficult time reconciling when I would --

THE COURT:  It's hard to reconcile.  It is hard to reconcile.  That's why I asked.

I frequently see people who are devoted sons, brothers, uncles, grandsons who have lived exemplary lives but who acted in a way that was totally out of character with how they live their life.  Oftentimes, their own family members are shocked when they see it.  Literally they say, "that's not my son," or "that's not my grandson," because people act out of character sometimes.

MR. OHM:  Certainly.

Maybe now is a good time to turn off the public line, Your Honor.

THE COURT:  Yes.  There is nobody here.

We will place this portion under seal.









THE COURT:  All right.

We can put the public line back on.

Thank you, Mr. Ohm.

I will say that both the government and the defense in this case have acted in the highest standards of their profession.  As a former defender myself, I am very proud of all of the federal defenders and defense lawyers I have seen who have taken these very, very difficult cases and defended these individuals zealously regardless of what their personal feelings are; and it is a credit to public defenders all over the country that this is happening.

Mr. Irizarry, I hope you do recognize that the very system you are protesting on January 6th has rallied to protect all of your rights and work very hard to see that you are treated fairly.

Somebody from his family wants to speak?

MR. OHM:  Yes.  I think both his mother and his sister.

THE COURT:  All right.  We don't have a lot of time; I have a hard stop at 5:20.  I will let you very briefly.

Come on up.

Just state your name for the record, please.

(Whereupon, the Court and staff confer.)

MRS. IRIZARRY:  My name is Lorraine Irizarry.  I also go by Avalon Irizarry.

First of all, Judge, again, I want to thank you for taking the time to read all of the letters of support; I know there were a lot of them.  Although we feel blessed, I know it took a lot of time for you, so I appreciate that.

I just want to come up to you and tell you that I, as a mother -- you asked me if I saw the videos.  I did see the videos.  Elias woke me up to watch the videos.

As I started seeing more and more of what was happening and people getting hurt, I was so upset that Elias went into the Capitol.  And I did keep thinking, like:  You

have lived this life.  Why would you go in?

But, again, as I started realizing everything that was happening, a little bit of his immaturity at the time -- and this part I don't want recorded.



THE COURT:  That's clear.

MRS. IRIZARRY:  Thank you.

You know, as a mom, you're like, yeah, my kid got in trouble, I am not surprised this happened to him.  But, like, I am.  I am.

And of course you know I am afraid of him going to prison.  But I just hope that you will show a little bit of leniency, but I trust you and I appreciate you.

Thank you for letting me speak.

THE COURT:  You're welcome.

MRS. IRIZARRY:  God bless you.

THE COURT:  Mr. Irizarry, I told you at your plea that you would have an opportunity, if you wanted to, to speak.  It's your decision.

I read your letter; it was very well written and very thoughtful.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  But if you would like to say something more, this is your chance.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.

THE DEFENDANT:  Firstly, I would like to say good

afternoon, Your Honor.

THE COURT:  Good afternoon.

THE DEFENDANT:  I would like to thank you for giving me the opportunity to say that I am so sorry for what I did and explain my thoughts about my mistake.

I'm sorry if I stutter at all.  I will be honest, I am a little nervous.

THE COURT:  Don't worry about it.

THE DEFENDANT:  My participation in an event like January 6th has brought great shame upon myself, my family, and even my country.

I would like to tell you that -- how sorry I am for --

THE COURT:  I would ask you -- I know you have some notes there.  But we tend to speed up when we read. Can you slow down a little bit for my court reporter?

THE DEFENDANT:  Yes, Your Honor.  I apologize for that.

While I was at the Capitol, I had no sense that police officers were about to be attacked and maybe were attacked.

When I left and was able to access my phone and see the horrifying videos of the violent acts done to police officers, I knew what I had taken part in was wrong; it is shocking to me when I watch that video now.  I didn't

remember it like that.  I didn't remember the looks on peoples' faces and how angry they were yelling.  I should have known to leave then, and I shouldn't have been there in the first place.

I am ashamed because I will always be a part of this disgrace.  At the time, I didn't really understand how beautiful our institutions were being as old as I was.

I knew the history behind our country, of course; I took all of the classes, et cetera.  But I wasn't able to make that connection and realize just how in depth they were and how fortunate I am to be living in a country like this. I wish I knew better at the time and I wish I had been stronger to stop and think about what was happening around me and if this crowd is really something that I would want to be seen as a part of.  But, unfortunately, at the time I lacked this.

January 6th represented something truly horrible; it was the largest attack on our democracy since the Civil War.  The idea of Americans being willing to fight other Americans and tear down the very institutions that millions of other Americans sacrificed and built and protect is horrible.  It is something I have to live with being a part of.

I don't know what I can do to make it right.  But first, I apologize for my part and my complicity in the events of that day.  I apologize to the Capitol Police and

staffers, and all of the victims of January 6th.

I want to apologize to the widows of Capitol Police and Metropolitan Police officers like Officer Sicknick, Officer Smith, Officer Liebengood, Officer Hashida and Officer deFreytag, who have to bury their partners because of that horrible day.

I want to thank the law enforcement officers who, while outnumbered, fought and sacrificed to defend our democracy.

No matter what is decided today, it is my promise I will work as hard as possible every day for the rest of my life to redeem myself to my family, to you, to the police, to the people who work in Congress, and to the people of Washington, D.C. who saw their beautiful city desecrated, and to this country.  While you see me today as a result of my foolish mistake, I hope that you will see me again someday and be proud of what you see.

Once again, thank you for giving me this opportunity, Your Honor.

THE COURT:  You are taking the wind out of my sails of my remarks, Mr. Irizarry, because the things you said are --

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  -- I am sorry to tell you that I don't hear from most of the January 6th defendants.  So I am glad

that you have done some thinking about this and recognized that there really were victims that day, and I appreciate the views that you have expressed for us.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you said everything you wanted to say?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  You can have a seat if you wish.

Now is the hard part for me and, frankly, the absolute worst part of my job.  I do not -- I really hate sentencings, and these cases are particularly difficult.  This case may be one of the most difficult I have had of the January 6th cases because Mr. Irizarry is so very young, and his background is really quite commendable to January 6th.

I am struggling.  I didn't sleep very well last night, as I am sure you didn't either, trying to come up with a sentence, as I must, that is sufficient but not greater than necessary to comply with the purposes of sentencing.

I have to consider the nature and circumstances of the offense which you have talked about which I don't need to dwell on because you recognize the seriousness of what happened on the 6th.

The history and characteristics of the defendant,

which your mother has talked about and your lawyer has written about which, up until then, are exemplary and shows someone who has lived a purposeful life who has overcome difficult circumstances; your mother's illness; your family was in very dire circumstances after your father left. You had to struggle and you have always worked hard; you have always been a good son and good brother -- those things are still true. Those things are still true.

And I disagree with your mother when she says you have had everything taken away because any parent should be proud hearing their child stand up and say what you say. Because one of the things I tell people, and is most true in this case -- a very wise lawyer named Bryan Stevenson said: We are not the worst thing we ever do. You are not -- this is not who you are; this is one thing you did.

On the internet things hang around. But it should not and you should not let it define your life going forward. You are 19 years old -- well, 21 now; you have a long life ahead of you.

I have to consider the types of sentences available. The government is asking for 45 days; probation has recommended 14 days; your lawyer is asking for probation, and I have pretty wide discretion in this case. And then, the need to provide restitution, which I don't need to speak on. You have already started that on your

own, and you have agreed to pay restitution. And you have already made a contribution in that regard.

The life that you led up until January 6th is commendable, and I have to take it into consideration in determining an appropriate sentence. But it cuts both ways in that: You should have known better, right?

The picture is a complicated one because while you -- there are factors in your life that may have made you not aware of some of the things that were going on around you -- the government is correct, though, that the facts are that you climbed in a broken window. I have looked at the videos of you climbing through that window. And I have seen so much of this videotape of these cases and it still never ceases to shock and amaze me about the chaos and the violence around you that day.

You want to be in the military. You wanted to be in the military. You wanted to perhaps be an officer who might be deployed to a wartime situation; well, that was it. Granted, you have no military training yet; you were a freshman in college. But still, the scene that day -- there was nobody who was there who could not have realized that what they were in the middle of was very, very bad.

I have had defendants in front of me who spent 4 minutes, 5 minutes, 6 minutes inside the Capitol; you spent 27 minutes. You didn't just go in and get your friend and

come out and leave.

You climbed up on things.  You had your pole.  You went in; you wandered around; you took pictures.  You climbed up on statues; you sat in offices smiling.  It was fun.  There was a carnival spirit that predominated that I do not understand that day by the people who were inside that quickly turned to shock and horror once they left that day and realized what they had been a part of, most of them.

But even after you came out -- I saw a picture of you sitting on a police car with that pole across your lap.  You hung around until the sun set; you didn't leave.  After you got your friend you hung around soaking in everything that was going on, the chaos, the violence, and the screaming.

It looks like, from some of that footage, that you were sort of enjoying watching everything going on -- which is not to say that you don't have remorse, which is not to say that you wanted anybody to get hurt, but people are complicated.

People's judgment gets clouded.  People will do things in a group, in a mob, that they would never, ever do on their own.  I have seen it over and over and over.  I see it with kids.  I see it all the time, especially with young people.  I have a 22-year-old and 24-year-old -- now, 24 and 26-year-old boys, so I know what I am talking about.

You exercised bad judgment that day, and that's what I am having to punish because by being part of that mob you lent support to it.  You may not -- as your mom said -- you may not have been one of them in that you are not marching around with horns on your head and swinging.  But by being there, by climbing through that window, by being a part of that -- you saw the videos of the swarms of people coming in there.

Imagine, for a moment, the outnumbered officers standing there watching as hundreds and thousands of people poured through those windows and those doors with backpacks; God knows what is in them, right?  Imagine how they felt.

So you may have, in your heart, not meant any violence to anybody but your presence there lent support to the mob.  And it wasn't just for a minute or 2 or 3.  It wasn't just to come in and get your friend.  You-all hung around, took pictures, walked, and then loitered on the premises even though the police were trying desperately to clear the area so that Congress could fulfill its function. So I have to take that into consideration.

The other thing I have to take into consideration is warranted disparity.  Your codefendant -- the closest defendant I come to you is your codefendant Mr. Bishai who is also very young, who has also had his dreams of -- I can't remember, was it paratrooper?  It was some --

MS. LANDON:  Firefighter.

THE COURT:  Right.

He wanted to join an elite unit he had been accepted to, and he lost it because of his case.  And he -- like you, he sort of -- he joined a firefighting unit out west.  He was trying to make the best of it.  And he is very similar to you.  I read the letter from his dad who I remember from his sentencing, and I was very compassionate.  And it strikes me that you two are definitely different from the codefendant, Mr. Sherrill.  But I looked at the sentence I gave him -- I looked at the presentence report in his case as well, and I remember his sentencing very carefully and very well.

I have looked at other defendants.  As I have often said, it's difficult to square the need to avoid unwarranted disparity because January 6th cases are so different from -- we don't even usually get misdemeanors in this courthouse, so they're just different from other cases we have had.

I look at how young you are.  I mean, you look even younger than you are.  I know your mom is terrified for your safety, and you must be.  And so -- and I take that into consideration as well.  I take into consideration the fact that you are working.  But I have to factor in the entirety of what you did that day.

The sentence that I gave your codefendant, which I think -- frankly, coming in here, Mr. Irizarry, I was of the mind that you deserved a harsher sentence than your codefendant because you waited longer.  There is something to be said for prompt acceptance of responsibility, but I believe Mr. Ohm when he tells me that that was not your decision but his.

I believe that the life you have lived and the conduct and your statement here indicate a genuine remorse and a genuine understanding that what you did was wrong, and a genuine sense of compassion for people who really were so injured that day.  I can't tell you about the officers that I have heard from who are still having PTSD, who have had to retire, who still have physical injuries from what happened that day.

I have done my best.  This is very, very difficult.  But having considered all of the factors -- will you stand with your lawyer, please.

Based on my consideration of all of the factors under Section 3553(a), it is the judgment of the Court that you, Elias Irizarry, are hereby committed to the custody of the Bureau of Prisons for a term of 14 days on Count 7.

I am not going to impose a term of supervised release because I don't believe one is necessary.  I don't believe you need to be supervised by a probation officer.  I

don't think you are ever going to -- I don't think you are ever going to violate the law again.  I think this was an aberration.  The resources and the tax-paying dollars of the United States don't need to be spent on you.  I actually agree with the probation office recommendation in this case, so no supervised release.

You are further ordered to pay a $25 special assessment and $500 in restitution, as you have agreed to in your plea agreement.

I find that you do not have the ability to pay a fine and I will, therefore, waive imposition of a fine.  I am not going to impose community service because I think you are already doing that.

The special assessment is immediately payable to the Clerk of the Court for the U.S. District Court of the District of Columbia.  Within 30 days of address you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

Pursuant to 18 U.S.C. Section 3742, you have a right to appeal the sentence that I have imposed subject to certain rights of appeal that you have waived as a part of your plea agreement in this case.  If you choose to appeal you must file an appeal within 14 days after I enter judgment.  If you are unable to afford the cost of an appeal you may request permission from the Court to file an appeal

without cost to you.

As set forth in the plea agreement, the government pledged to move to dismiss the indictment against Mr. Irizarry.

Does the government wish to do so now?

MS. AKERS:  Excuse me, Your Honor?

THE COURT:  Are you moving to dismiss the indictment?

MS. AKERS:  Yes.  The remaining counts as to this defendant, correct.

THE COURT:  Yes.  The motion is granted.

MS. AKERS:  I was thinking "information," but it is an indictment with his codefendant.  Thank you.

THE COURT:  Mr. Ohm, it is unlikely based on what I have heard that Mr. Irizarry will be -- given the shortness of the sentence -- I don't know, Ms. Landon may know -- it's unlikely that he will actually go to the Bureau of Prisons -- a BOP facility for 14 days.  It's just -- it's very likely it's going to be local.  That's another reason why I did 14 days.

MR. OHM:  Apparently, Mr. Bishai went to FMC in Lexington.

THE COURT:  He did?  Lexington is good.  It's not bad.  Is that your recommendation?

MR. OHM:  Our request was going to be Butner.

THE COURT:  Butner.  That would be my request

given his age, yes, and other factors.

I don't have control over the Bureau of Prisons -- believe me, I wish I did, but I don't.  My recommendation to the Bureau of Prisons is that he go to Butner, in the event you do go to a facility for your sentence.

I am going to allow you to remain on release.  I have told you that it was important that you comply, and this is why.  You have been in full compliance.

Because you have been sentenced now, you have to turn up on the day you are ordered to self-surrender or else you can be charged with a new charge.  If you pick up any new charges while on release pending self-surrender you would be subject to advanced penalties.  If you violate any of my conditions of release, you will be sent to jail immediately and charged with contempt of court; I know you are not going to do any of those things.

I will tell you something, I am so confident that you will -- see, everybody makes mistakes; some are more serious than others, and yours was a big one.  It was a big one, it landed you here; and it's resulted in a lot of things -- in the loss of a lot of things that you worked really hard for.  Life is like that, it takes us on strange journeys.  You are at such an early stage in yours, you don't know what road lies ahead for you.

I suspect you are going to make something very

remarkable of your life; I hope you do.  I hope you talk to other people -- your family, your girlfriend, your sister, your mom, your half-brother, your family members, your community members -- they're watching you.  They watched you rise and they watched you fall.  The measure of a person's character is what they do when they fall.  How you pick yourself up from this, how you lead your life -- that's what people will judge you by; not what you did today, but what you do with the rest of your life.  Your mother and your family are confident that you are going to do great things.

I am going to offer, consistent with my ethical restraints -- I have to check to see if this is something I can do.  But if you decide to reapply to the Citadel, I will write you a letter.  Okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  If I can.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I have to check with -- but I will write you a letter.

MRS. IRIZARRY:  Thank you.

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  Because I am that convinced that you are a good candidate and that you are the kind of person who can serve their country.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Good luck to you, Mr. Irizarry.

THE DEFENDANT:  Thank you, Your Honor.

MRS. IRIZARRY:  Thank you.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

(Whereupon, the proceeding concludes, 5:17 p.m.)

* * * * *

**CERTIFICATE**

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 31st day of October, 2023.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter